(No. 62476.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LEONARD KIDD, Appellant.

*Opinion filed September 20, 1989.*

CALVO, J., took no part.

Paul P. Biebel, Jr., Public Defender, of Chicago (Richard E. Cunningham, Assistant Public Defender, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Thomas V. Gainer, Jr., Kevin Sweeney, Renee G. Goldfarb, and Inge Fryklund, Assistant State's Attorneys, of counsel), for the People.

JUSTICE STAMOS delivered the opinion of the court:

Defendant, Leonard Kidd, pleaded guilty in the circuit court of Cook County to nine counts of murder, one count of armed robbery, one count of aggravated arson, and four counts of concealment of homicidal deaths. The trial court entered judgment on the pleas, and a jury was impaneled to decide whether the death sentence should be imposed. The jury found that defendant had attained the age of 18 or more at the time of the offense, that additional statutory aggravating factors existed (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(b)(3), (b)(6), (b)(7)), and that there were no mitigating factors sufficient to preclude the imposition of the death penalty. The judge imposed the sentence of death. Execution was

stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); Ill. Rev. Stat. 1983, ch. 38, par. 9—1(i); 107 Ill. 2d Rules 603, 609(a).

We will briefly summarize only the facts necessary for resolution of the cause. Defendant was arrested, with his stepbrother Leroy Orange, on January 12, 1984, in connection with the discovery of four bodies, that same day, in a third-floor apartment in a building located at 1553 West 91st Street in Chicago. Authorities found the bodies after responding to a fire at that address. All of the victims had died from repeated stab wounds. Three of the victims, identified as Renee Coleman, Michelle Jointer and Ricardo Pedro, were adults, and the other victim was identified as Anthony Coleman, the 10-year-old son of Renee Coleman. Both defendant and Orange made statements to the police shortly after their arrests. Orange admitted in a signed confession to stabbing all four victims and setting the apartment on fire while in the presence of defendant.

Defendant's statement corroborated Orange's statement. Defendant admitted being at the apartment on January 12, 1984, during the commission of the offenses. He stated that he saw Orange stab Ricardo Pedro and tie him up. Defendant stated that he attempted to stop Pedro's bleeding; Orange later returned and stabbed Pedro in the neck. According to defendant's statement, Pedro broke loose, and Orange stabbed him approximately three more times. Orange then tied up and gagged the other victims, with the exception of Anthony Coleman, whom Renee Coleman tied up. According to both Orange's and defendant's statements, Orange then stabbed Renee, Anthony and Michelle, in that order. Orange then started two separate fires in the apartment. Following that, Orange gathered up the knives used in the killings, and other items from the crime scene, and the pair left the apartment and deposited the knives and various

items in garbage cans in the surrounding area. Defendant later led the police to the items.

Orange and defendant were later jointly indicted for the murders of the four victims, armed violence, concealment of homicidal death, felony murder, armed robbery and aggravated arson. The trial court granted Orange's motion to sever their trials; a jury later convicted Orange of murder, aggravated arson, and concealment of a homicidal death. He was acquitted of armed robbery. The trial court subsequently sentenced Orange to death, and his convictions and sentences were affirmed in part and reversed in part on appeal to this court. *People v. Orange* (1988), 121 Ill. 2d 364.

At arraignment both defendants were represented by the same attorney, Earl Washington. Washington subsequently withdrew his representation of defendant and on April 19, 1984, Assistant Cook County Public Defender Paul Stralka was appointed to represent defendant.

On October 4, 1984, Stralka appeared in court with defendant and advised the court that he had learned that the State had interrogated defendant without Stralka's knowledge on September 14, 1984. On October 10, Stralka filed a motion for disclosure; although not in the record, it apparently asked the State to disclose any of the statements given by defendant, and whether the State planned to use any statements at trial or a sentencing hearing. At a hearing on the motion the next day, the State indicated that it would use the results of that interrogation only as evidence in aggravation at sentencing. Testimony of one of the interrogating officers at the sentencing hearing revealed that defendant was interrogated concerning his role in an unrelated 1980 fire in which 10 children died. The officer testified that he gave defendant his *Miranda* warnings and that defendant chose to speak to the detectives and assistant State's Attorney present. The officer admitted knowing

that defendant was represented by counsel on the pending charges. During the interrogation, defendant admitted setting the fire, pointing out on a photograph a closet in which he said he set the fire.

On May 14, 1985, defendant's attorney informed the court that defendant planned to testify on behalf of Orange at Orange's trial. Defendant's attorney indicated that he had advised defendant of his fifth amendment privileges and had advised him not to testify. After questioning defendant, the trial court ascertained that it was defendant's decision to testify at Orange's trial.

On May 21, 1985, defendant testified at Orange's trial that he, not Orange, had stabbed all four victims and set the apartment on fire. He stated that Orange left the apartment at 2:30 a.m. and never came back, and denied that Orange participated in the offenses in any way. To impeach defendant, the State published to the jury defendant's original statement given to the police after his arrest.

On August 5, 1985, defendant, present with counsel, pleaded guilty to nine counts of murder, one count of armed robbery, one count of aggravated arson (for setting a fire at the 1553 West 91st Street apartment), and four counts of concealment of homicidal deaths. The court entered judgment on defendant's pleas. Because the State was seeking the death penalty, the case was set for sentencing before a jury. On August 8, before *voir dire* had begun, defendant made an oral motion to withdraw his pleas of guilty. The court requested that the motion be submitted to the court in writing in order to preserve the record and then denied the motion. On August 12, the trial court read into the record that the court was in possession of a written motion by defendant seeking to withdraw his guilty plea.

During the first phase of the death penalty hearing, which started on August 9, 1985, the State presented

the testimony of several police officers and detectives who were called to the scene and investigated the offenses at issue; of the Cook County medical examiner; and of a court reporter from Orange's trial who read defendant's testimony from that trial to the jury. The jury returned verdicts finding that three statutory aggravating factors existed: that Pedro was killed intentionally by defendant in the course of an armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)(c)), that defendant intentionally murdered two or more individuals (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3)), and that Anthony Coleman was under 12 years of age and that his death resulted from exceptionally brutal or heinous behavior (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(7)).

At the second phase of the death penalty hearing, the State presented the testimony of Chicago police Sergeant Joseph Murphy, who testified that he had investigated a fire that took place on October 28, 1980, at 1512 East 65th Place in Chicago, in which 10 children died. The cause of the fire could not be determined, but the origin of the fire was determined to be a closet in the living room area on the first floor.

According to Murphy's testimony, he was informed in September 1984 by Assistant State's Attorney Irv Miller that Miller had received information implicating defendant in the 1980 fire, and that if Murphy questioned defendant, he would relate his involvement in the 1980 fire. Murphy arranged to interrogate defendant about the 1980 fire on September 14, 1984, while defendant was in custody for the charges stemming from the case at bar. Although Murphy was aware at that time that defendant was represented by counsel, defendant's counsel was never advised that defendant was to be the subject of a police interrogation. Defendant was interviewed by Murphy, two detectives of the Chicago police department, and a Cook County assistant State's Attorney on

September 14. Defendant was questioned about the 1980 fire after being given *Miranda* warnings. Defendant's counsel was not present. After initially denying that he had set the fire, upon being shown photographs of the victims, defendant confessed.

Defendant also testified on his own behalf, corroborating his testimony at Orange's trial that he stabbed the four victims. He denied that he set the 1980 fire. The jury found that no mitigating factors sufficient to preclude imposition of the death penalty existed, and the court sentenced defendant to death.

Defendant first challenges the adequacy of the admonitions given him by the trial court before the court accepted his pleas of guilty, and the trial court's subsequent refusal to permit him to withdraw his guilty pleas. Defendant asserts, citing *Boykin v. Alabama* (1969), 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709, and Supreme Court Rule 402 (107 Ill. 2d R. 402), that his due process rights were violated because he was never informed of, nor did he understand, the minimum sentence he could receive. He contends, therefore, that the court's refusal to permit him to withdraw his pleas was an abuse of discretion.

Rule 402 provides in part:

> "In hearings on pleas of guilty, there must be substantial compliance with the following:
>
> (a) Admonitions to Defendant. The court shall not accept a plea of guilty without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:
>
> * * *
>
> (2) the minimum and maximum sentence prescribed by law * * *." 107 Ill. 2d R. 402.

Defendant and counsel appeared in open court on August 5, 1985, at which time counsel asked the court to participate in a pretrial conference pursuant to Supreme

Court Rule 402 (107 Ill. 2d R. 402). Defendant acknowledged this request on his behalf.

The court advised the defendant of his rights to testify and his rights to appeal. The court also reminded the defendant that his testimony given during Orange's trial could be used against him.

The record shows that the following discussion then took place:

"THE COURT: Do you understand that, sir?

THE DEFENDANT: Yes, sir.

THE COURT: Do you have any problem? What is your problem, sir?

THE DEFENDANT: Well, what my main concern was the sentence, being life without parole, right?

THE COURT: No. That's not necessarily what the sentence may be. That question would be a question for a jury to decide, not for me to make that decision.

I would strongly urge you to use that particular approach, since I have sentenced your brother to death. Certainly my hands are pretty much tied with reference to that matter. I would have to follow that particular aspect, but a jury may not agree to that, so accordingly, you would have that opportunity to submit your point of view with reference to whether or not that sentence should be invoked upon you.

Now, whether or not a life sentence, that is something that controlled by the statute. I have no control over that. That is certainly matters that I must follow based upon the law.

Do you understand that, sir?

THE DEFENDANT: Yes, sir."

The Court then permitted defendant to take 10 minutes to decide what to do. Court reconvened and the judge advised defendant that the State would drop some of the charges against him if he pleaded guilty. The State nol-prossed several charges. The trial judge advised the defendant of the charges against him by reading the indictments verbatim. When the trial judge com-

pleted his reading of the indictments, he added: "As a result of those charges this Court or a jury could in fact invoke a death sentence upon you ***."

The defendant acknowledged that he understood and wanted to plead guilty. Accordingly, the court extensively admonished the defendant of his rights to a jury trial. The court carefully explained that all of defendant's rights would be waived by his decision to plead guilty, and defendant executed a written jury waiver form acknowledging that he was doing so voluntarily.

The trial court also summarized the nature of the procedures:

"THE COURT: [T]he first phase is the decision whether or not you are guilty of the charges before this court. Then there is another phase whereby this Court or a jury can decide whether or not a death sentence should be invoked, that you should be given a death sentence.

Do you understand that?

THE DEFENDANT: Yes, sir."

A transcript of defendant's testimony at Orange's trial and transcripts of testimony of several other witnesses from Orange's trial were admitted, by way of stipulation, as a factual basis for the pleas.

The court accepted defendant's pleas and defendant elected to have a jury determine his sentence. The cause was set for jury selection three days later, on August 8, 1985. On that date, defendant made an oral motion to withdraw his guilty pleas, and stated that there were "some things that I didn't quite understand."

At that point in the proceedings, the trial court asked for a legal basis to support defendant's motion to withdraw his pleas and directed that a written motion to withdraw be submitted. The record reveals the following colloquy:

"THE DEFENDANT: There were a few things that I thought was going another way.

THE COURT: What other things?

THE DEFENDANT: Such as this thing about life without parole. Did you know about that?

THE COURT: Yes, sir, I know what the law is.

THE DEFENDANT: I mean did you know about it?

THE COURT: Yes.

THE DEFENDANT: Either that or the death penalty.

THE COURT: Yes, sir.

THE DEFENDANT: Well, I didn't quite understand you good.

\* \* \*

THE COURT: How come you didn't understand me? I believe the maximum sentence that the Court was required under the law to advise you that if you are found guilty and the jury decides that you are subject to the death penalty and indicate that the death penalty should be given in the case, that is the maximum sentence that can be imposed upon you.

In fact, if they do not agree to it, then I have to sentence you to prison, and the law provides that if you are sentenced to prison, it is a life sentence without parole. That is what the law is."

The court concluded that there was no legal justification for withdrawal of the pleas and denied defendant's motion. A written motion to withdraw the pleas was filed on August 12, 1985, and thus the record was properly preserved.

The State contends that the record "belies defendant's claim of misunderstanding" and concludes that "obviously having been told by his attorney that [life imprisonment without parole] was the minimum sentence possible if he entered a plea of guilty to the charges, defendant wanted to clarify if this were true." Citing *People v. Williams* (1983), 97 Ill. 2d 252, the State argues that the trial court properly admonished defendant here, because an admonition is sufficient if an ordinary person in the circumstances of the accused would under-

stand it to convey the required warning. *Williams*, 97 Ill. 2d at 269.

Rule 402 was adopted to insure compliance with the requirements of *Boykin v. Alabama* (1969), 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709 (due process requires that a plea of guilty must be affirmatively shown to be voluntary and intelligent before it can be accepted). (*People v. Hillenbrand* (1988), 121 Ill. 2d 537, 554.) The reproduced portions of the record clearly demonstrate that the trial court did not properly admonish defendant of the minimum sentence prescribed by law as required by Rule 402. The minimum sentence that could have been imposed here was mandatory natural life imprisonment. Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1)(c); *People v. Taylor* (1984), 102 Ill. 2d 201.

Nowhere on the record did the trial court inform defendant, before accepting his pleas, that the court must sentence him, at a minimum, to mandatory natural life imprisonment. The only thing the trial court told defendant, concerning the minimum sentence, before accepting his pleas was that "whether or not a life sentence, that is something that is controlled by the statute. I have no control over that." This statement in no way conveyed to defendant that the minimum sentence defendant would receive was natural life imprisonment. The admonition was therefore insufficient under *Williams*; failure to properly advise a defendant of the minimum sentence he can receive if he persists in pleading guilty does not convey the warning required by our Rule 402.

As the above excerpt from the record indicates, it was not until the trial court addressed defendant's motion to withdraw his pleas that the court succinctly stated what the minimum and maximum penalties were. While the trial court repeatedly emphasized, before accepting defendant's pleas, that the death penalty was the maxi-

mum sentence, the court failed to state what the minimum sentence was. A proper admonition would have informed the defendant that, if he persisted in the pleas, the court was required to sentence him to natural life imprisonment pursuant to section 5—8—1(a)(1)(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1)(c)) if the jury should not impose the death penalty. See *People v. Clark* (1987), 119 Ill. 2d 1, 5.

This court has consistently held that the record must disclose that the consequences of a plea of guilty have been fully explained to a defendant before we will permit the plea to stand. (*People v. Ballheimer* (1967), 37 Ill. 2d 24, 26.) In *Ballheimer*, this court noted, "[t]he expressions by the trial court were inadequate. The decision to plead guilty to a criminal accusation is a grave personal judgment and an accused should not be allowed to enter such a plea unless the defendant has a full comprehension of the possible consequences of so pleading." *Ballheimer*, 37 Ill. 2d at 26.

The State argues that under *People v. Walker* (1986), 109 Ill. 2d 484, Rule 402 need only be substantially complied with in order to meet the requirements of *Boykin* that a guilty plea be made intelligently and voluntarily. In *Walker*, the defendant pleaded guilty to two counts of murder and one count of armed robbery; a jury subsequently found that he should be sentenced to death. Prior to accepting his pleas, the trial court told the defendant that the two murder counts would be considered separately in sentencing and that the defendant could be sentenced on each count to a penalty ranging from 20 years' imprisonment to the death penalty. The court also told the defendant that it could enhance or double any term of years imposed and that one possible sentence was natural life imprisonment. The defendant argued on appeal that under *People v. Taylor* (1984), 102 Ill. 2d 201, the trial court would be forced to sentence

him to natural life imprisonment if he was not sentenced to die, and that the trial court's admonition that he might receive a term of years was misleading.

The court first noted that "it cannot be stated certainly that the admonition was erroneous" (*Walker*, 109 Ill. 2d at 497), because the defendant had been sentenced before *Taylor* had been decided. The court went on to assume, however, that the admonition, on its face, could be misleading. After noting that the requirements of Rule 402 need only be substantially complied with to satisfy the requirements of due process, the court held that the defendant had not been misled by the trial court's admonition. The court observed that the defendant had no expectations that were denied, as "defendant and his attorney stated on separate occasions that the defendant expected nothing less than natural life imprisonment as a punishment." (*Walker*, 109 Ill. 2d at 499.) We believe that *Walker* is distinguishable and that our holding in *Ballheimer* governs this issue.

Unlike *Walker*, our holding in *Taylor* was settled law when the trial court admonished defendant here, and the trial court, therefore, had a duty under the plain requirements of Rule 402 to communicate to defendant that the minimum sentence he could receive if he persisted in his pleas was mandatory natural life imprisonment. Moreover, in *Walker*, the trial court did tell the defendant that he might receive natural life imprisonment; here, the trial court failed to disclose this to defendant at all. Finally, as this court stated in *Walker*, the defendant and his attorney had stated on the record that the defendant expected nothing less than natural life imprisonment. The same affirmative showing cannot be made here.

In *Ballheimer*, before accepting the defendant's guilty plea, the trial court told the defendant that if the defendant pleaded guilty, the court would have to sentence him " 'in accordance with the statute.' "

(*Ballheimer*, 37 Ill. 2d at 25.) The defendant escaped and was again admonished before pleading guilty on other charges that if he did so, he " 'would be sentenced according to the law.' " (*Ballheimer*, 37 Ill. 2d at 25.) This court held that these statements were inadequate. The court noted that "[t]his court has consistently held that the record must disclose that the consequences of a plea of guilty have been fully explained to an accused before we will permit such a plea to stand." *Ballheimer*, 37 Ill. 2d at 26.

*Ballheimer* and Rule 402 mandate that a defendant be advised of both the minimum and maximum sentence prescribed by law before he can make a knowing and intelligent decision to plead guilty to a criminal charge. By simply telling defendant that whether or not he would get a life sentence is something controlled by the statute over which the trial court has no control, the trial court failed to spell out to him the minimum sentence prescribed by law. This failure clearly means that the admonition in this instance was not in substantial compliance with Rule 402.

The State, citing *People v. Hale* (1980), 82 Ill. 2d 172, finally argues that defendant's subjective impressions, in the absence of substantial objective proof, do not provide sufficient grounds upon which to set aside defendant's guilty pleas. *Hale* is inapposite, however. The defendant in *Hale* did not argue that the trial court had improperly admonished him in violation of Rule 402; the *Hale* defendant's argument centered on his subjective impressions that he could withdraw his plea within 30 days of its entry. This court's holding rested on defendant's claim of a mistaken subjective impression, not an improper admonition, and is therefore inapplicable to this case.

For all of the above reasons, we conclude that defendant's pleas were not made knowingly and intelli-

gently. Allowing the withdrawal of a guilty plea is a matter within the trial court's discretion. (*People v. Hillenbrand* (1988), 121 Ill. 2d 537, 545; 107 Ill. 2d R. 604.) Because the trial court did not comply with the requirements of Rule 402, the denial of defendant's motion to withdraw his pleas was an abuse of discretion. Accordingly, the judgment of the trial court on defendant's pleas must be vacated, and defendant must be allowed to withdraw his pleas of guilt and plead anew (107 Ill. 2d R. 604(d)); defendant's death sentence, in turn, must also be vacated.

As we conclude that the trial court's judgment on defendant's pleas and the death sentence must be vacated, and the cause remanded to allow the defendant to withdraw his pleas and plead anew, we address only those issues which may arise again. *People v. Fierer* (1988), 124 Ill. 2d 176, 191; see *People v. Wilson* (1987), 116 Ill. 2d 29, 42.

In his briefs to this court, defendant argues that the admission at the second phase of the death penalty hearing of his confession to the 1980 arson violated his sixth amendment right to counsel because the confession was obtained through police interrogation in the absence of his counsel.

The State argues that the admission at the death penalty hearing of defendant's confession to an unrelated arson-murder which was obtained in complete accord with defendant's sixth amendment rights was proper. Relying on *People v. Martin* (1984), 102 Ill. 2d 412, and *Maine v. Moulton* (1985), 474 U.S. 159, 88 L. Ed. 2d 481, 106 S. Ct. 477, the State contends that defendant's sixth amendment right to counsel had not attached as to the 1980 arson-murder and that defendant therefore had no sixth amendment right to have counsel present at the interrogation.

The record indicates that on September 14, 1984, while defendant was in custody for the offenses at issue, he was moved to the State's Attorney's office adjacent to the Cook County jail for questioning. Although Sergeant Murphy, a Chicago police department detective who arranged and conducted the interrogation, was aware that defendant was in custody on the instant charges and was represented by counsel, he never notified defendant's counsel that the defendant was to be interrogated. After being given the standard *Miranda* warnings, defendant confessed that he started the fire in 1980 that resulted in the deaths of 10 children.

An examination of the record reveals that the introduction of the defendant's confession to setting the 1980 fire was a major evidentiary element of the State's case in aggravation at the second phase of the death penalty hearing. The State referred to the 1980 fire, the victims of the fire by name, and defendant's confession in its opening statement at the second phase of the death penalty hearing. The State called Sergeant Murphy to the stand; Murphy testified to initially investigating the fire after it occurred in 1980. Murphy then testified about interrogating defendant in 1984 and defendant's subsequent confession to setting the 1980 fire. Finally, after denying the State's request to publish certain photographs of the victims of the fire to the jury, the trial court urged the jury to strongly consider the fire as an aggravating factor.

The United States Supreme Court has held that the right to counsel attaches with the initiation of adversary, judicial criminal proceedings, and that this may occur by way of formal charge, preliminary hearing, indictment, information, or arraignment. *Brewer v. Williams* (1977), 430 U.S. 387, 398, 51 L. Ed. 2d 424, 436, 97 S. Ct. 1232, 1239; *Kirby v. Illinois* (1972), 406 U.S. 682, 689, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1882 (plurality

opinion); see *Maine v. Moulton* (1985), 474 U.S. 159, 170, 88 L. Ed. 2d 481, 492, 106 S. Ct. 477, 484; *People v. Wilson* (1987), 116 Ill. 2d 29, 50.

In the case at bar, because of a conflict of interest, defendant's initial attorney, who had represented defendant at defendant's arraignment, withdrew as counsel on April 19, 1984, and the court appointed Assistant Public Defender Stralka that same day as defendant's counsel. Stralka did not find out about the September 14, 1984, interrogation until October 4, 1984.

Contrary to the State's argument, we believe that the United States Supreme Court's decision in *Maine v. Moulton* (1985), 474 U.S. 159, 88 L. Ed. 2d 481, 106 S. Ct. 477, mandates a finding that defendant's sixth amendment right to counsel was violated in this case.

The defendant in *Moulton* was indicted, along with a codefendant, on several counts of auto theft. Defendant, represented by retained counsel, appeared before the trial court and entered a plea of not guilty to the charges. Defendant's similarly indicted codefendant agreed to cooperate with the police, and he subsequently wore a secret listening device during conversations with defendant concerning the pending charges, among other things. After the codefendant's role as an informant had been revealed to defendant, the State had the impending indictments dismissed and obtained seven new indictments realleging the pending charges and also charging defendant with burglary, arson, and three more thefts. At defendant's trial, the State offered into evidence portions of the secretly taped conversations. Defendant appealed his convictions on the ground that the admission into evidence of his statements to his codefendant violated his sixth amendment right to the assistance of counsel.

The Supreme Court initially noted "that, at the very least, the prosecutor and police have an affirmative obli-

gation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." (474 U.S. at 171, 88 L. Ed. 2d at 493, 106 S. Ct. at 484.) The sixth amendment right to counsel is violated when the "State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." 474 U.S. at 176, 88 L. Ed. 2d at 496, 106 S. Ct. at 487.

The Court rejected the government's argument that the incriminating statements obtained by the Maine police should not be suppressed because the police had other, legitimate reasons for listening to defendant's conversations with his codefendant; the police, the government argued, are able to investigate other crimes defendant might have committed. The Court acknowledged that police have an interest in investigating not only crimes for which formal charges have been filed, but also new or additional crimes. (474 U.S. at 179, 88 L. Ed. 2d at 498, 106 S. Ct. at 489.) The Court recognized that the police may seek information about an individual who is charged with one crime and is a suspect in another crime. The Court noted, however, that "[i]n seeking evidence pertaining to pending charges *** the Government's investigative powers are limited by the Sixth Amendment rights of the accused." (474 U.S. at 179-80, 88 L. Ed. 2d at 498, 106 S. Ct. at 489.) The Court observed that to allow the admission of evidence obtained in violation of a defendant's sixth amendment rights whenever the police assert a legitimate and alternative reason for their investigation risks the evisceration of the sixth amendment right to assistance of counsel. 474 U.S. at 180, 88 L. Ed. 2d at 498, 106 S. Ct. at 489.

The Court balanced that concern against the danger of frustrating society's interest in police investigation of

crime by excluding evidence pertaining to charges as to which the sixth amendment right to counsel had not attached at the time evidence was obtained, simply because other charges were pending at that time. (474 U.S. at 180, 88 L. Ed. 2d at 498, 106 S. Ct. at 489.) The Court resolved this conflict by holding that "incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel." (474 U.S. at 180, 88 L. Ed. 2d at 498-99, 106 S. Ct. at 489.) In a footnote, the Court stated that "[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses." 474 U.S. at 180 n.16, 88 L. Ed. 2d at 499 n.16, 106 S. Ct. at 489 n.16.

Because we believe that a pretrial interrogation by the State used to garner evidence later used at a death penalty hearing is a critical stage in the proceedings (see *Estelle v. Smith* (1981), 451 U.S. 454, 469-71, 68 L. Ed. 2d 359, 373-74, 101 S. Ct. 1866, 1876-77), and a State agent, in the case at bar, deliberately elicited incriminating statements, used to support the State's case that defendant was deserving of the death penalty, deliberately in the absence of defendant's counsel, we find that defendant's sixth amendment right to counsel was violated. *Moulton*, 474 U.S. at 180, 88 L. Ed. 2d at 498-99, 106 S. Ct. at 489.

The State asserts that law enforcement officials in the case at bar were seeking evidence pertaining to the pending charges; under *Moulton*, the State contends, the only question is whether defendant's sixth amendment rights had attached as to the 1980 arson-murder. Although we agree with the State that at the time of the

interrogation concerning the 1980 arson-murder, no sixth amendment right to counsel had attached as to those uncharged offenses, *Moulton* held that evidence obtained by State agents pertaining to pending charges is to be excluded at a trial of those charges, notwithstanding the fact that the police were investigating other crimes, if the police knowingly circumvented defendant's sixth amendment right to counsel, which had attached as to the pending charges. (474 U.S. at 179-80, 88 L. Ed. 2d at 498-99, 106 S. Ct. at 488-89.) The record indicates that although the detective who arranged and conducted the interrogation of defendant was aware that defendant was represented by counsel, defendant's attorney was not notified until almost three weeks later. The State relied heavily on the introduction of defendant's confession at the second phase of the death penalty hearing to prove aggravation. We find, therefore, that the detective knowingly circumvented defendant's right to counsel by refusing to notify defendant's counsel, knowing that defendant was represented by counsel. While the State may not be prohibited from introducing defendant's confession in a prosecution for the 1980 fire, as defendant concedes in his reply brief (see *Moulton*, 474 U.S. at 180 n.16, 88 L. Ed. 2d at 499 n.16, 106 S. Ct. at 489 n.16), it is prohibited, under *Moulton* and *Estelle*, from introducing defendant's uncounseled statements at the death penalty hearing on the pending charges.

The State contends that this court's decision in *People v. Martin* (1984), 102 Ill. 2d 412, addressed and rejected the same argument defendant now urges before this court.

In *Martin*, the defendant was arrested and taken into custody on a rape charge. An assistant public defender was subsequently appointed to represent him at a preliminary hearing. Approximately a month later, while in custody on the rape charge, the police initiated an inter-

rogation of defendant regarding a murder charge, at which defendant made an incriminating statement. Defendant was subsequently charged and convicted of murder following a trial at which the State introduced the incriminating statements into evidence. Defendant asserted that his sixth and fifth amendment rights had been violated.

This court found that the defendant's sixth amendment right to counsel was not violated; no sixth amendment right to counsel had attached as to the offense of murder, with which defendant had not been charged at the time of the interrogation, because no adversary judicial proceedings had been initiated concerning the murder. (102 Ill. 2d at 423.) Our holding in *Martin* is not inconsistent with our holding in the case at bar. We have already noted, as the Court in *Moulton* specifically stated, that admission of defendant's statements given during the interrogation are not inadmissible in a trial for the 1980 arson-murder. Our holding today only precludes the State from introducing those statements at the death penalty hearing following defendant's convictions on the instant charges. We find that *Martin*, therefore, is inapplicable to this case.

The State, relying on *Patterson v. Illinois* (1988), 487 U.S. 285, 101 L. Ed. 2d 261, 108 S. Ct. 2389, argues that defendant waived his sixth amendment right to counsel by responding to police questioning after being given *Miranda* warnings. In *Patterson*, the United States Supreme Court held that a defendant knowingly and intelligently waived his sixth amendment right to counsel when he responded to police statements, after being given *Miranda* warnings, without invoking his fifth or sixth amendment right to counsel. *Patterson* does not support the State's contention, however, because the Court noted that the defendant in *Patterson* had not retained, or accepted by appointment, a lawyer

to represent him at the time he was questioned by the police, and specifically stated that "[o]nce an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect." (*Patterson*, 487 U.S. at 290 n.3, 101 L. Ed. 2d at 271 n.3, 108 S. Ct. at 2393 n.3.) In the case at bar, defendant was represented by counsel. *Patterson*, therefore, does not support the State's theory of waiver, and we hold that defendant did not waive his right to counsel.

In *Estelle v. Smith* (1981), 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866, the Supreme Court held that statements obtained from a defendant in violation of his fifth amendment rights were inadmissible at a death penalty hearing; "[g]iven the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to observe fundamental constitutional guarantees." (*Estelle*, 451 U.S. at 463, 68 L. Ed. 2d at 369, 101 S. Ct. at 1873.) Because defendant's sixth amendment rights were violated, his statements given during the September 14, 1984, interrogation and all references to them are inadmissible at a future trial or sentencing hearing. See *People v. Szabo* (1983), 94 Ill. 2d 327, 360.

We next address defendant's contention that his death sentence must be reversed because it was based in part on an unconstitutional provision of our Criminal Code, section 9—1(b)(7) (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(7)). As we have stated, the jury found defendant eligible for the death penalty based on its finding that three statutory aggravating factors existed. The third statutory aggravating factor found by the jury is set forth in section 9—1(b)(7), which provides as follows:

"[T]he murdered individual was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(7).)

Defendant, relying on the United States Supreme Court's recent decision in *Maynard v. Cartwright* (1988), 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853, challenges the constitutionality of this provision. Defendant contends that under *Maynard*, section 9— 1(b)(7) violates the eighth amendment because it is unconstitutionally vague.

The Supreme Court in *Maynard* addressed an aggravating circumstance which made a defendant eligible for the death penalty if the murder was "especially heinous, atrocious, or cruel." The Supreme Court has held that this type of aggravating factor or circumstance is not unconstitutionally vague on its face (*Godfrey v. Georgia* (1979), 446 U.S. 420, 422, 64 L. Ed. 2d 398, 403, 100 S. Ct. 1759, 1762, citing *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909), although it found in *Godfrey* that the aggravating factor at issue was unconstitutionally applied.

In *Maynard*, the Supreme Court affirmed the judgment of the Tenth Circuit Court of Appeals, which held petitioner's death sentence invalid because the State court's construction of the aggravating circumstance was unconstitutionally vague under the eighth amendment. (*Maynard*, 486 U.S. at 360, 100 L. Ed. 2d at 379, 108 S. Ct. at 1857, citing *Cartwright v. Maynard* (10th Cir. 1987), 822 F.2d 1477, 1483, 1492.) The Supreme Court explained that "our cases have insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action." (*Maynard*, 486 U.S. at 362, 100 L. Ed. 2d at 380, 108 S. Ct. at 1858.) The Court, relying on *Godfrey*, held that the "especially heinous" provision was unconstitutionally applied because

the language of the provision was vague and failed to provide sufficient guidance to the sentencer.

This court recently considered the validity of section 9—1(b)(7) in light of *Maynard*. (*People v. Odle* (1988), 128 Ill. 2d 111, 138-41.) In *Odle*, we held that section 9—1(b)(7) as applied in that case did not suffer from the same constitutional infirmity as the statute in *Maynard*. (128 Ill. 2d at 140.) First, our statute is "much more specific in describing the conduct which qualifies an accused for the death penalty than the Oklahoma statute which was considered in *Maynard*." (128 Ill. 2d at 140.) This court explained that "the conduct which brings about the victim's death must not only be exceptionally brutal or heinous, it must *also* be such that it is indicative of wanton cruelty." (Emphasis in original.) (128 Ill. 2d at 141.) In addition, the victim must be under the age of 12. Second, we judged that the statute is "not susceptible to arbitrary application when the requirements of the statute are strictly followed." (128 Ill. 2d at 140.) We found that in light of the agonizing manner in which the 11-year-old victim was killed (by strangulation) and the determined manner in which defendant carried out that murder, the sentencer had not applied the aggravating factor arbitrarily or capriciously. 128 Ill. 2d at 141.

Our decision in *Odle* controls this case, and accordingly we reject defendant's contention that section 9—1(b)(7) of the Criminal Code of 1961 is unconstitutional.

We are aware of the opinion of the United States District Court for the Central District of Illinois, filed April 29, 1989, in the case of the *United States ex rel. Silagy v. Peters* (C.D. Ill. 1989), 713 F. Supp. 1246. In that case the court held the Illinois death penalty statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1) unconstitutional. In passing on Federal constitutional questions, State courts and lower Federal courts have the same responsibility and occupy the same position. Until the Supreme Court of

the United States has spoken, State courts are not precluded from exercising their own judgments on Federal constitutional questions. Because lower Federal courts exercise no appellate jurisdiction over State courts, decisions of lower Federal courts are not conclusive on State courts, except insofar as the decision of the lower Federal court may become the law of the case. *United States ex rel. Lawrence v. Woods* (7th Cir. 1970), 432 F.2d 1072; see also *City of Chicago v. Groffman* (1977), 68 Ill. 2d 122; *People v. Stansberry* (1971), 47 Ill. 2d 541.

Defendant also asserts, and the State concedes, that pursuant to *People v. Johnson* (1986), 114 Ill. 2d 69, defendant's conviction for aggravated arson under section 20—1.1(a)(1) of the Code (Ill. Rev. Stat. 1983, ch. 38, par. 20—1.1(a)(1)) must be reversed. See *People v. Zeisler* (1988), 125 Ill. 2d 42.

Defendant raises a number of other arguments regarding his convictions and his death sentence, but they are issues that are unlikely to recur on retrial, and thus need not be considered in this appeal. For all of the above reasons, the judgment of the court entered on defendant's pleas of guilty and the death sentence are vacated and the cause remanded to allow defendant to withdraw his pleas and plead anew.

*Judgment vacated and remanded,*
*with directions.*

JUSTICE CALVO took no part in the consideration or decision of this case.