(No. 75620.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RONALD BURT, Appellant.

*Opinion filed September 21, 1995.—Rehearing denied December 4, 1995.*

52

Charles M. Schiedel, Deputy Defender, and John J.

Hanlon, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Arleen C. Anderson and Michael A. Hurst, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE NICKELS delivered the opinion of the court:

Defendant, Ronald Burt, was charged with first degree murder and other offenses relating to the January 16, 1992, shooting deaths of H. Steven Roy and Kevin Muto. A jury was empaneled to hear the charges in the circuit court of Stephenson County. On the fourth day of trial, prior to the presentation of any defense, defendant changed his plea from not guilty to guilty. On the basis of this plea, defendant was convicted of two counts each of first degree murder and armed robbery. At a separate sentencing hearing, the same jury found defendant eligible for the death penalty pursuant to the multiple-murder aggravating factor. (See 720 ILCS 5/9—1(b)(3) (West 1992).) The jury further determined that there were no mitigating circumstances sufficient to preclude imposition of that sentence and defendant was sentenced to death. (720 ILCS 5/9—1(g) (West 1992).) Defendant's death sentence has been stayed pending direct appeal to this court. (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rules 603, 609(a).) We affirm.

## BACKGROUND

H. Steven Roy operated a farm in Stephenson County. Roy rented the farm from James Erwin, who lived on a neighboring farm. Erwin testified that he saw a strange van parked near Roy's house on the morning of January 16, 1992. He testified that he observed some commotion around the van, with someone apparently

attempting to brush his feet through the snow to cover the van's tracks as it exited the farm. As the van passed Erwin's farm, he observed three individuals in the van. Later that afternoon, Erwin and another neighbor checked on Roy and discovered the body of Kevin Muto in a bedroom. Muto worked as a farmhand for Roy. Roy's body was subsequently discovered in a separate bedroom. Both had been shot.

The following day, defendant was arrested in connection with these crimes. Detective Rocco Wagner interviewed defendant. Defendant initially maintained that he knew nothing about the crimes. After the detective told defendant that they already had information concerning his involvement from Dannie Booth and David Craig, defendant began to discuss the events leading up to the deaths of Roy and Muto. This discussion was eventually memorialized in a three-page written statement.

In this initial written statement, defendant described how Booth, who was 14 years old, woke him up early that morning, requesting that he take Booth to Roy's farm. Booth claimed that Roy owed him $500 for work he had performed on the farm. Defendant and Booth then contacted Craig, who agreed to drive them to Roy's farm in exchange for $100. The statement then described how the three of them obtained some gasoline and proceeded to Roy's farm.

When defendant, Booth and Craig arrived at the farm, Roy invited them into his home. Defendant and Craig retired to another room to sleep, but they were awakened by an argument between Booth and Roy. Craig then began to search through Roy's belongings, discovering a double-barrel twelve-gauge shotgun, a .22-caliber rifle and some shells in a closet. Roy and Booth entered the room and found defendant holding the rifle. Defendant pointed the gun at Roy and demanded his

wallet. Booth took the wallet and found $7 inside. Defendant then ordered Roy to walk to a back bedroom.

According to the statement, defendant and Booth followed Roy to the bedroom. Craig remained in the hallway. In the bedroom, Roy and Booth again began to argue. Defendant then shoved Roy onto the bed. When Roy moved, defendant shot him in the back of the head because he thought Roy may try to "pull something." Booth then took the rifle and shot Roy in the back several times. Defendant, Booth and Craig then took a VCR and some meat from Roy's refrigerator. At that time they were interrupted by a knock on the back door.

Kevin Muto, an 18-year-old farmhand, was at the back door. Booth answered the door and told Muto that Roy was sleeping and did not want to be disturbed. When Muto refused to leave, Booth called defendant to the door and took the gun from him. According to defendant's statement, Booth then walked Muto to a second bedroom and took his wallet. Booth then ordered Muto to lie on the floor and shot him in the back of the head and the back. Defendant then took the rifle and shot Muto in the back. Defendant, Booth and Craig then left the house with the meat, the VCR, a gun and some of Roy's personal checks. These items were later used to obtain drug money. As they left the driveway, Booth scuffed the snow with his feet to cover the tire tracks.

On January 18, defendant provided a tape-recorded statement in which defendant gave essentially the same story. Defendant stated that he shot Roy first. Defendant stated that he and Craig then discussed shooting Booth because they feared he would disclose what had happened. Having heard this, Booth then took the rifle from defendant and shot Roy several more times. In the tape-recorded statement, defendant again stated he shot Muto in the back only after Booth shot Muto in the head and back.

On January 24, defendant initiated a second tape-recorded statement. In this statement, defendant claimed that he had not shot Muto. Instead, defendant claimed that Booth alone was responsible for that killing. Defendant claimed that he had previously stated that he shot Muto only to protect Booth, because he was so young. Defendant claimed that he changed his mind about protecting Booth after finding that Booth was blaming defendant for "the whole thing."

Prior to trial, the State filed a motion *in limine* to exclude the January 24 statement. The State argued that this statement was self-serving and not reliable. The trial court granted the State's motion, finding that the statement was unreliable hearsay. Defense counsel clarified on the record that the court's ruling applied only to the trial, not sentencing. The court advised defense counsel that he could renew any objections at the sentencing hearing and the court would pass on the objection at that time. Defense counsel did not attempt to introduce this statement at defendant's sentencing hearing.

Defendant also filed several pretrial motions. Defendant filed a motion seeking the appointment of a mitigation specialist. This motion specifically sought to appoint David Randall, M.A., to perform a "life history" investigation. The trial court denied the motion, ruling that such a mitigation specialist would duplicate the work done by a psychologist or psychiatrist, and the investigator that the court had previously appointed.

Defendant also filed several motions to secure the testimony of several out-of-state witnesses for purposes of presenting this testimony at the mitigation phase of sentencing. Defendant sought to secure the testimony of Robert Burt, Mary Burt and Steve Holcomb. Robert Burt, who lived in California, is defendant's younger brother. Mary Burt, who lived in Texas, is defendant's

grandmother. Steve Holcomb, who lived in Arkansas, is defendant's stepfather. The trial court refused to compel the attendance of these witnesses, finding that the defendant had failed to make a showing of the materiality of the witnesses' testimony. Robert Burt and Steve Holcomb did not testify at defendant's sentencing hearing. The jury heard videotaped testimony from Mary Burt.

Prior to defendant's midtrial pleas of guilty, the State presented testimony from a variety of witnesses. These included James Berning, a deputy sheriff, who testified about his arrest of defendant. Berning also testified that he recovered Roy's driver's license and five of his checkbooks from defendant's car. Steven Carrol, a jailor with the Stephenson County sheriff's department, testified that he recovered a pen from defendant's shirt pocket imprinted with the name "H.S. Roy." Barbara Franks, a Rockford supermarket clerk, testified that on January 17, 1992, defendant attempted to cash a check purported to have been signed by Roy.

The State also presented evidence from the officers that took defendant's statements. Detective Wagner testified regarding defendant's typewritten statement obtained on January 17, 1992, in which defendant admitted his involvement in the killings. Deputy Sheriff Wishard testified concerning the tape-recorded interview with defendant that occurred on January 18, 1992. Wishard also identified a drawing defendant made showing the layout of the house and identifying the location of each person at the time of Roy's murder.

Dr. Larry Blum testified concerning the autopsies he performed on Roy and Muto. Dr. Blum testified that Roy died from four gunshot wounds to the head. Dr. Blum also testified that a gunshot wound to Roy's back was a contributing cause of his death. Dr. Blum testified that Muto died from two gunshot wounds to the head. Blum also testified that the two gunshot wounds to Muto's back were contributing causes of his death.

After four days of trial, defendant abruptly changed his plea from not guilty to guilty on the charges of first degree murder and armed robbery. Prior to accepting defendant's pleas, the court admonished defendant concerning the consequences of his pleading guilty to the charges. After the conclusion of the sentencing hearing, defendant moved to vacate his guilty pleas, arguing that the court's admonishments were defective and therefore his guilty pleas were not knowingly entered. Additional facts concerning the hearing on defendant's pleas will be presented as necessary to meet defendant's challenges on appeal.

With the defendant having been convicted on the basis of his pleas, the State then sought to prove defendant eligible for the death penalty pursuant to two aggravating factors. First, the State sought to prove defendant was eligible for the death penalty under the multiple-murder aggravating factor. (See 720 ILCS 5/9—1(b)(3) (West 1992).) Second, the State sought to prove defendant eligible for the death penalty pursuant to the murder in the course of another felony aggravating factor. (See 720 ILCS 5/9—1(b)(6) (West 1992).) The jury returned a verdict finding defendant eligible for the death penalty only under the multiple-murder aggravating factor.

Defendant's death penalty hearing then proceeded to the consideration of matters in aggravation. The State presented two witnesses. The State first presented the testimony of Detective Steven Kudzma. Detective Kudzma testified concerning a statement he took from defendant after his arrest in which defendant admitted his involvement in two burglaries in Winnebago County. Detective Kudzma testified that he read defendant his *Miranda* warnings and that defendant agreed to waive those rights and provide a statement. On cross-examination, Detective Kudzma admitted that he did

not inquire as to whether defendant was represented by an attorney. Defendant argues on appeal that the introduction of this statement during his sentencing hearing violated his sixth amendment right to counsel.

The State also presented testimony from Leonard Bond, a correctional officer at the Stateville prison. Bond testified that during a routine shakedown of defendant's prison cell, a homemade knife was discovered. On cross-examination, Bond testified that the discovery of such contraband in prison is a common occurrence, as many inmates manufacture such items for their personal safety.

In addition to this testimony, the State introduced certified copies of the records of defendant's prior convictions. The records indicate that in 1984 defendant was convicted of obstructing a police officer in Winnebago County. Also in 1984, defendant was convicted of robbery in Ogle County. In 1989, defendant received two convictions for retail theft and one conviction for obstructing a police officer in Winnebago County. Also in 1989, defendant was convicted of forgery in Peoria County and for burglary in Fulton County. In 1990, defendant was convicted in Winnebago County of the offense of escape.

Defendant presented the testimony of seven witnesses in mitigation. Roxie Pingel, defendant's aunt, described defendant as anxious and hyperactive. Pingel testified that defendant assisted with chores and looked after his sister during his childhood. Pingel also testified that defendant was "knocked around" by his mother's boyfriends. Sheila Holcomb, defendant's half-sister, also testified concerning defendant's hyperactivity and troubled home life. Sheila testified that her parents often abused alcohol and that her father abused other drugs. Sheila also testified that her brother often protected her from the beatings of her mother's boyfriends.

A videotaped statement was admitted from defendant's grandmother, Mary Burt. In this statement, Mary discussed the death of defendant's father when defendant was an infant, and how after his death defendant's mother began to abuse alcohol. Mary further testified that defendant's mother did not take adequate care of him after this time. Mary also discussed abuse that defendant suffered from his mother and stepfather, Steve Holcomb. Mary also believed that Holcomb had introduced defendant to drugs and alcohol at a young age.

Misty Young, a former girlfriend of defendant, and Colleen Hada, Young's mother, testified concerning defendant's violent home life and drug addiction. Young testified that she lived across the street from defendant and that he was regularly beaten by his mother's boyfriend when he attempted to intervene in their violent episodes. Young also testified that defendant was addicted to drugs, that he attempted to quit several times, and that he suffered serious withdrawal episodes. Hada testified that defendant had been a great help to her family. Hada testified that defendant assisted her with her retarded granddaughter and ran errands for the family.

Another former girlfriend, Leslie Perkins, also testified in mitigation. Perkins is the mother of defendant's son. Perkins testified that defendant is a good father. Perkins also testified that she lived for a time with defendant in his mother's home. During this time, she observed the violence that occurred between defendant and his mother and her boyfriend. Perkins described defendant's conflicts with his mother's boyfriend as shoving matches. Perkins also testified that defendant used drugs and attempted suicide several times during their relationship.

Dr. Linda Wetzel, a clinical psychologist, provided expert testimony for the defense. Dr. Wetzel reviewed

defendant's school records, medical reports and family history. Dr. Wetzel also performed a battery of neuropsychological tests on defendant. From this investigation, Dr. Wetzel concluded that defendant suffered from frontal lobe brain impairment. Dr. Wetzel testified that this condition was caused by defendant's attention deficit hyperactivity disorder and the cumulative effect of closed head injuries defendant suffered throughout his life. Dr. Wetzel also testified that defendant has an IQ of 79, placing on the "borderline range of intelligence." As a result of these impairments, Dr. Wetzel concluded that defendant was suffering from an extreme mental and emotional disturbance at the time of the offenses.

After considering this evidence, the jury determined that there were no mitigating factors sufficient to preclude imposition of the death penalty. (720 ILCS 5/9—1(g) (West 1992).) Defendant was sentenced to death. (720 ILCS 5/9—1(g) (West 1992).) The trial court denied defendant's post-trial motions for a new trial and sentencing hearing. Defendant seeks review of his conviction and sentence in this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rules 603, 609(a).

## ISSUES

On appeal, defendant raises only one challenge to his conviction. Defendant argues that his guilty pleas should be vacated because the trial court's admonishments were defective and therefore his pleas were not knowingly entered. Specifically, defendant argues that the trial court's admonishments were defective for three reasons. First, the trial court failed to adequately inform him that natural life imprisonment is the mandatory minimum sentence that could be imposed. Second, the trial court failed to inform defendant that he could elect bench sentencing. Third, the trial court failed to inform defendant that a new jury could have been empaneled for sentencing.

Defendant also argues that a new sentencing hearing is required because: (1) his sixth amendment right to counsel was violated by the introduction of his confession to two burglaries at the aggravation phase of sentencing; (2) the trial court erred in denying his motion to secure several out-of-state mitigation witnesses; (3) his trial attorneys were ineffective for failing to introduce at sentencing his January 24, 1992, statement in which he denied killing Muto; (4) the trial court erred in denying his motion for appointment of a particular mitigation specialist; and (5) his death sentence is unreasonably disparate from the 40-year term of imprisonment imposed on Booth, his 14-year-old accomplice.

Defendant also raises two general constitutional challenges to the Illinois death penalty statute: (1) that the death penalty statute violates the eighth and fourteenth amendments because it places a burden of proof on the defendant which precludes meaningful consideration of mitigation; and (2) that the death penalty statute violates the eighth and fourteenth amendments because it does not sufficiently minimize the risk of arbitrary and capriciously imposed death sentences.

## Discussion

### I

Defendant pleaded guilty to two counts of first degree murder and two counts of armed robbery. Prior to accepting his pleas, the trial court admonished the defendant regarding the consequences of pleading guilty to the charges. After the conclusion of his sentencing hearing, defendant moved to withdraw his guilty pleas. In this motion, defendant argued that he was not properly admonished regarding the potential sentences at the time of his pleas. The trial court denied this mo-

tion. On appeal, defendant further argues that the admonishments were defective in that they failed to inform him of his right to bench sentencing or to a new sentencing jury. We reject defendant's claims.

## A

Defendant first asserts that the trial court's admonishments were defective because he was not informed that the mandatory minimum sentence was natural life imprisonment. In order to satisfy due process, a guilty plea must be affirmatively shown to have been made voluntarily and intelligently. (See *Boykin v. Alabama* (1969), 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709.) Rule 402 was adopted to insure compliance with these due process requirements. (134 Ill. 2d R. 402, Committee Comments, at 340.) Rule 402 provides in part:

> "In hearings on pleas of guilty, there must be substantial compliance with the following:
>
> (a) Admonitions to Defendant. The court shall not accept a plea of guilty without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:
>
> * * *
>
> (2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences[.]" (134 Ill. 2d R. 402.)

As the rule states, substantial compliance with the rule is sufficient to satisfy due process. (*People v. Walker* (1985), 109 Ill. 2d 484, 498; *People v. Stewart* (1984), 101 Ill. 2d 470, 484, quoting *People v. Krantz* (1974), 58 Ill. 2d 187, 192.) In addition, we may consider the entire record in determining whether defendant understood the nature of the charges against him. *Krantz*, 58 Ill. 2d at 192.

At the hearing on defendant's pleas, the court admonished defendant in the following manner:

"THE COURT: But then you know that I won't decide what your punishment is. The Jury will be given an opportunity to hear some more evidence, whether it's presented or not, and then the attorneys can argue about the eligibility, and I will instruct about the eligibility with the death penalty, and if they determine your eligibility, then they go onto determine whether it should be imposed. Now, these have to be unanimous verdicts by the Jury, either way.

What I want you to understand is *the alternative they would consider would be life imprisonment,* and they would make that determination. It would not be automatic either way. *That's why they have to make a decision as to the death penalty or life without parole. Do you understand that?*

THE DEFENDANT: Yes, I do." (Emphasis added.)

Defendant argues that this admonishment is similar to the admonishment found insufficient in *People v. Kidd* (1989), 129 Ill. 2d 432. In *Kidd,* the trial court admonished the defendant that the question of a natural life sentence "would be a question for the jury to decide" and "whether or not a life sentence, that is something that is controlled by the statute. I have no control over that." The *Kidd* court found that this admonishment failed to inform the defendant that a life sentence was the mandatory minimum sentence:

"Nowhere on the record did the trial court inform defendant, before accepting his pleas, that the court must sentence him, at a minimum, to mandatory natural life imprisonment. The only thing the trial court told defendant, concerning the minimum sentence, before accepting his pleas was that 'whether or not a life sentence, that is something that is controlled by the statute. I have not control over that.' This statement in no way conveyed to defendant that the minimum sentence defendant would receive was natural life imprisonment." (*Kidd,* 129 Ill. 2d at 443.)

Defendant argues that the trial court similarly failed to inform him that natural life imprisonment was the mandatory alternative to the death penalty. Although

"life imprisonment" was referred to as the "alternative" to the death penalty, defendant argues there was no indication that it was the "mandatory alternative."

We find that the trial court's admonishments substantially complied with the requirement of Rule 402 that defendant be advised of the mandatory minimum sentence that could be imposed. Unlike *Kidd*, the trial court did not merely refer to life imprisonment as a sentencing option controlled by statute. Instead, the trial court asserted that the jury would "make a decision as to the death penalty or life without parole." The trial court identified the only two sentences that may be imposed, and further described life imprisonment as the "alternative" to the death penalty. Given this admonishment, we reject defendant's claim that he pleaded guilty without knowing that life imprisonment was the minimum sentence prescribed by law.

Defendant further argues that we should consider his mental disabilities in determining whether the admonishments given adequately advised him that life imprisonment was the mandatory minimum sentence. The record of defendant's plea hearing belies the assertion that his mental capabilities prevented him from understanding the consequences of his plea. At his plea hearing, the trial court found defendant alert and capable of understanding the proceedings. Defendant stated on the record that he was able to read and write and that he understood the proceedings to that point. Defendant also repeatedly stated that he understood the court's admonishments. Indeed, nothing in the record supports defendant's assertion that his mental disabilities prevented him from otherwise understanding the court's admonishments.

## B

Defendant argues that the trial court's admonishments were defective for two additional reasons. First,

defendant argues that the admonishments were defective because they failed to advise him of his right to waive the jury and elect bench sentencing. (See 720 ILCS 5/9—1(d)(3) (West 1992).) Second, defendant argues that the admonishments were defective because they did not inform him that he could have a new jury empaneled for sentencing. (See 720 ILCS 5/9—1(d) (West 1992).) Defendant did not raise these issues in his plea hearing or in his motion to vacate his pleas. As such, these issues are waived. 134 Ill. 2d R. 604(d); *People v. Davis* (1991), 145 Ill. 2d 240, 250.

Defendant concedes that he waived these issues by failing to raise them at the time of his pleas or in his motion to vacate those pleas, but requests review under the plain error doctrine. (134 Ill. 2d R. 615(a).) The plain error doctrine is a limited exception to the waiver rule. (*People v. Herrett* (1990), 137 Ill. 2d 195, 209.) "The doctrine of plain error is applied to remedy errors so plain and prejudicial that failure to object to them is not a waiver for purposes of appeal." (*Davis,* 145 Ill. 2d at 251.) We note that the admonishments defendant requests are not required by Rule 402. In addition, defendant presents no compelling argument to support his claim that the failure to give these admonishments prevented him from knowingly pleading guilty. As such, we decline defendant's invitation to review these alleged errors under the plain error doctrine.

## II

Defendant next argues that a new sentencing hearing is required because his sixth amendment right to counsel was violated by the introduction of his confession to two burglaries at the aggravation phase of sentencing. Defendant relies again on *People v. Kidd* (1989), 129 Ill. 2d 432. In *Kidd*, the defendant was arrested and charged with multiple counts of murder. After an attorney had been appointed for these charges,

defendant was questioned by police officers concerning an unrelated arson involving several deaths. Defendant waived his *Miranda* rights and confessed to the arson. This confession was then used at the aggravation phase of defendant's capital sentencing hearing.

On appeal, this court in *Kidd* determined that the introduction of the uncounseled confession at defendant's sentencing hearing violated his sixth amendment right to counsel. (*Kidd*, 129 Ill. 2d at 451.) The *Kidd* court first noted that the sixth amendment right to counsel, being offense specific, attaches with the initiation of adversarial judicial criminal proceedings. (*Kidd*, 129 Ill. 2d at 448.) Thus, the defendant's sixth amendment right to counsel attached in regard to murder charges for which he was on trial, but not for the arson questioning. For this reason, the court noted that there is no sixth amendment bar to a later prosecution for the arson offense because defendant's sixth amendment rights for that charge had not attached. (*Kidd*, 129 Ill. 2d at 452.) However, the uncounseled confession could not be used at defendant's capital sentencing hearing. The *Kidd* court stated:

> "Because we believe that a pretrial interrogation by the State used to garner evidence later used at a death penalty hearing is a critical stage in the proceedings [citation], and a State agent, in the case at bar, deliberately elicited incriminating statements, used to support the State's case that defendant was deserving of the death penalty, deliberately in the absence of defendant's counsel, we find that defendant's sixth amendment right to counsel was violated." *Kidd*, 129 Ill. 2d at 451.

Defendant argues that the facts of his case are identical to *Kidd*. After defendant had been indicted for the murders of Roy and Muto, Detective Kudzma interviewed defendant in jail regarding some unsolved burglaries that occurred in Winnebago County. Detective Kudzma read defendant his *Miranda* warning and defendant agreed to waive those rights. Defendant then

provided Kudzma with a statement detailing his participation in two burglaries. The State then used this statement at the aggravation phase of defendant's capital sentencing hearing.

The State responds that any error is waived. Defendant objected to the introduction of the statement at sentencing, but only on grounds that defendant's waiver of his *Miranda* rights was invalid and the statement was not voluntary. Defendant did not specifically object to introduction of the statement on sixth amendment grounds, although defense counsel did note during argument that defendant's attorney was not contacted prior to the interview. The trial court overruled defendant's objection, finding that defendant voluntarily waived his *Miranda* rights. As the sixth amendment challenge was not adequately raised, the trial court had no opportunity to pass on the argument defendant now makes. Moreover, defendant did not include any challenge to the use of this statement in his motion for a new sentencing hearing. As such, we agree with the State that defendant has waived this issue for review. 134 Ill. 2d R. 604(d); *People v. Pasch* (1992), 152 Ill. 2d 133, 216.

Defendant requests that we consider the alleged error under the plain error rule. (134 Ill. 2d R. 615(a).) In the context of a sentencing hearing, we will review an error that is not properly preserved as plain error where the evidence is closely balanced or the error is so fundamental that it may have deprived the defendant of a fair sentencing hearing. (*People v. Beals* (1994), 162 Ill. 2d 497, 511.) For reasons that follow, we conclude that neither circumstance is present in this case.

The evidence presented in defendant's capital sentencing hearing was not closely balanced. Defendant was convicted of a double homicide. Both victims were robbed prior to being shot multiple times at close range in execution style murders. Each shot required the

calculated task of reloading the single-shot rifle. In addition, the jury heard about defendant's extensive criminal history including convictions for robbery, burglary, forgery and escape. Against this evidence, the jury heard that defendant had a long drug history, mental difficulties and a troubled childhood. We do not consider this evidence to be closely balanced.

We also do not believe that the introduction of the statement deprived defendant of a fair sentencing hearing. In defendant's statement, he admits to participating in two burglaries. In one of these burglaries, defendant assisted a friend in robbing his father's home. In the second, defendant stole some personal property in order to obtain drug money. Neither crime involved any acts of violence. The State introduced defendant's statement through the testimony of Detective Kudzma. Detective Kudzma's testimony was brief and merely provided a foundation for defendant's statement without giving any details of the burglaries. In addition, the State only briefly referred to these crimes during closing arguments. We also note that the jury was otherwise aware of defendant's extensive criminal history, including a separate conviction for burglary. Under such circumstances, the introduction of defendant's statement did not affect the fairness of the sentencing hearing. Accordingly, we do not agree that the introduction of defendant's statement constitutes plain error.

### III

Defendant next contends that he is entitled to a new sentencing hearing because the trial court erred in refusing to compel the attendance of three out-of-state witnesses. Specifically, defendant sought to compel the attendance of his grandmother, Mary Burt, his brother, Robert Burt, and his stepfather, Steve Holcomb. Defendant wished to present testimony from these witnesses at the mitigation phase of his capital sentencing hearing.

In order to secure the attendance of these witnesses, defendant moved for issuance of a "certificate under the seal of the court" pursuant to section 3 of the Uniform Act to secure the Attendance of Witnesses from Within or Without a State in Criminal Proceedings (Act) (725 ILCS 220/3 (West 1992)). That statute provides in part:

> "Witness from another state summoned to testify in this State. If a person in any state, which by its laws has made provision for commanding persons within its borders to attend and testify in criminal prosecutions, or grand jury investigations commenced or about to commence, in this state, *is a material witness in a prosecution pending in a court in this state,* or in a grand jury investigation which has commenced or is about to commence, a judge of such court may issue a certificate under the seal of the court *stating these facts* and specifying the number of days the witness will be required. *** This certificate shall be presented to a judge of a court of record in the county in which the witness is found." (Emphasis added.) (725 ILCS 220/3 (West 1992).)

Our Act is similar to the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings. (11 U.L.A. 262 (1995).) The purpose of such statutes is to promote the administration of justice by enabling courts of one State, through principles of comity with another State, to secure material witnesses for criminal prosecutions. 81 Am. Jur. 2d *Witnesses* § 34 (1992).

In an effort to prevent undue hardship on witnesses and overreaching, the Act contemplates that the moving party bear the burden of providing sufficient facts from which the trial court can determine the materiality of the witnesses' testimony. Both the court in the requesting State and the court in the county in which the witness is found must review the facts presented and determine whether the witness must be compelled to travel and testify. Where insufficient facts are presented, the trial court is within its discretion to refuse

to issue the certificate under seal of court or enforce such a certificate from a foreign court. *In re Adams* (1976), 64 Ill. 2d 269, 274; *People v. Nash* (1966), 36 Ill. 2d 275, 281.

Defendant did not initially seek to secure a certificate under seal of court to compel the attendance of Mary Burt. Defendant first sought to secure the videotaped testimony of Mary Burt in a pretrial motion. In that motion defendant asserted that Mary Burt is unable to travel, and supported this with a note from her physician stating that she was not medically stable. Defense counsel submitted an affidavit stating only that he interviewed Mary Burt and "[s]he provided me with information which, in my opinion as a lawyer, is relevant and admissible in evidence." The trial court refused to rule on the defendant's motion, stating that it could not determine the substance of the expected testimony. The trial court requested that defense counsel submit an affidavit concerning the substance of Mary Burt's expected testimony so that he could rule whether her deposition should be taken.

Defense counsel again thereafter renewed his motion to secure the videotaped deposition. Defense counsel submitted an affidavit stating that Mary Burt "was involved in and witness to occurrences in Defendant's life which the defense believes are essential to the presentation of Defendant's case." The trial court found the allegations of defendant's affidavit were insufficient.

Defense counsel thereafter filed a motion to reconsider the denial of the motion to take Mary Burt's videotaped testimony. In addition, defendant sought the issuance of a certificate under seal of court to compel her attendance. In support of these motions, defendant's attorney presented an affidavit stating that Mary Burt had physical custody of defendant for "long periods" and would testify "to physical abuse, parental neglect

and poor environment as it relates to the defendant." At the hearing on defendant's motion, the State attacked the sufficiency of defendant's allegations, arguing that no facts were presented from which a determination of the witness' necessity could be made. The trial court denied both motions, finding that he could not determine from the facts presented what the substance of her testimony was or whether it was material.

Defendant thereafter renewed both the motion to secure the videotaped testimony of Mary Burt and the motion to issue a certificate under seal to compel her attendance. In support of these motions, defense counsel submitted an affidavit stating that the witness could provide information regarding defendant's upbringing, including information about head injuries, malnutrition, incidence of violence in the home, drug and alcohol abuse and criminal activity. The State argued that the information presented was insufficient to determine whether the testimony was material, and that much of this testimony would be cumulative of that presented by other mitigation witnesses. The trial court denied the defendant's motions, finding that the reasons for his earlier rulings had not changed.

Still prior to trial, defendant moved for the issuance of a certificate under seal to compel the attendance of defendant's brother Robert Burt from California. Defendant submitted no affidavit to support this motion. The motion stated only that Robert Burt would testify to "the early life of [defendant], his habits, the beatings he received from his stepfather and the poor environment in which he was raised." The trial court denied defendant's motion.

During the presentation of evidence at defendant's capital sentencing hearing, defendant orally renewed his motion to compel the attendance of Mary and Robert Burt in order to preserve the record. At this time,

defendant orally added a request to issue a certificate under seal of court to obtain testimony from Steve Holcomb, defendant's stepfather, who resided in Arkansas. Defendant filed no motion or affidavit relating to Steve Holcomb concerning the nature of his testimony. The trial court denied these motions. Notwithstanding the court's rulings, an attorney in Texas videotaped Mary Burt's testimony and this videotape was played for the jury.

We find that the trial court was within its discretion in determining that defendant had failed to make a showing that the witnesses he wished to present were material. As stated, both the issuing court and the court where the certificate is directed must be able to determine from the facts presented that the witness is material to the proceedings. Whether a particular witness is material requires more than a showing that he or she may have admissible testimony, but also requires a qualitative judgment that the testimony is necessary to the proceeding. Despite repeated admonishments by the court to do so, defendant failed to provide any detail regarding the substance of the proposed testimony that would enable the trial court to determine whether the testimony was material. In addition, we note that defendant presented mitigation evidence from a variety of witnesses that covered the subject matter identified in his affidavits and his appeal fails to identify any information that he was unable to present to the jury. Thus, we find that the trial court did not abuse its discretion in refusing to issue the certificates under seal of court.

Defendant argues that the trial court found that the witnesses were not material because they were "only" mitigation witnesses. However, defendant's claim distorts the trial court's reasoning. The trial court stated that not every witness who may possess mitigation testimony is necessarily a material witness that may be

compelled to attend defendant's sentencing hearing. Although a witness may possess obvious mitigation testimony, such testimony may not be necessary where it is cumulative of other evidence or insubstantial in nature. For this reason, the request for the issuance of a certificate under seal must contain some indication of the substance of the expected testimony beyond the bare assertion that it is mitigation evidence of a particular nature. The trial court clearly indicated that it would issue the certificates if defendant made the requisite factual showing of materiality of the mitigation testimony. Defendant failed to do so. Thus, defendant's claim is without merit.

## IV

Defendant next argues that he was denied his constitutional right to effective assistance of counsel at his sentencing hearing. Specifically, defendant argues that his trial counsel was ineffective for failing to introduce at sentencing his third statement to police. In this statement, defendant claimed that he had not shot Muto. Instead, defendant claimed that Booth alone was responsible for that killing. This was inconsistent with defendant's two previous statements in which he admitted shooting Muto in the back after Booth shot him in the head. Defendant claimed that he had previously stated that he shot Muto only to protect Booth, because he was so young. Defendant claimed that he changed his mind about protecting Booth after finding that Booth was blaming defendant for "the whole thing."

This statement was ruled inadmissible at defendant's trial. The trial judge granted the State's pretrial motion *in limine* to exclude this statement, finding that the statement was unreliable hearsay. Defense counsel clarified on the record that the court's ruling applied only to the trial, not sentencing. The court advised defense counsel that he could renew any objections at the

sentencing hearing and the court would pass on the objection at that time. Defense counsel did not attempt to introduce this statement at defendant's sentencing hearing.

Defendant argues that the failure to introduce this statement at sentencing constituted ineffective assistance of counsel. Whether a defendant received effective assistance of counsel is governed by the two-part test articulated in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, which this court adopted in *People v. Albanese* (1984), 104 Ill. 2d 504, 526:

> "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.)

When reviewing counsel's conduct, there is a strong presumption that counsel's conduct "falls within the wide range of reasonable professional assistance." (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) Furthermore, in order to show prejudice in the context of a capital sentencing hearing, a defendant bears the burden of showing that "there is a reasonable probability that, but for counsel's deficient conduct, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." (*People v. Brisbon* (1995), 164 Ill. 2d 236, 246.) A

claim of ineffective assistance of counsel may be disposed of on prejudice grounds alone, without an examination of whether counsel was deficient. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

Defendant was not prejudiced by the failure of his trial counsel to admit the exculpatory statement at sentencing. We initially note that the trial court excluded the statement from defendant's trial because the statement was self-serving, and therefore inadmissible as unreliable hearsay. Although the standards for admissibility of evidence at sentencing are relaxed, such evidence must still be "relevant and reliable." *People v. Edgeston* (1993), 157 Ill. 2d 201, 236.

Even assuming that the reliability of the statement would satisfy the relaxed evidentiary standards applicable at sentencing, the defendant cannot show a fair probability that the result of his sentencing hearing would have been different had the statement been admitted. In this statement, defendant contends that Booth alone shot Muto. However, in two earlier statements defendant admitted shooting Muto in the back after Booth shot him in the head. Defendant claimed to have made these earlier statements implicating himself in the shooting of Muto only to protect Booth because he was so young. We fail to understand how the defendant's admission to shooting Muto in the back protects Booth. For this same reason, we do not believe that the sentencing jury would have found defendant's exculpatory statement credible. As the statement is not credible, the failure to admit it at defendant's sentencing hearing did not prejudice defendant. We therefore reject defendant's ineffective-assistance-of-counsel claim.

## V

Defendant next contends that he is entitled to a new sentencing hearing because the trial court erred in denying his motion for a particular mitigation expert. Defen-

dant sought the appointment of David Randall, M.A., who defendant alleged had experience in over 50 death penalty cases. After extensive briefing and argument concerning the role of a mitigation expert, the trial court denied defendant's motion. The trial court determined that the role of the mitigation expert would be duplicative of work that could be performed by an investigator and a psychologist or psychiatrist.

Defendant argues that the denial of his request for the appointment of David Randall deprived him of his constitutional rights to due process, equal protection, the effective assistance of counsel, and a reliable death penalty determination. As support for his assertion, defendant cites *Ake v. Oklahoma* (1985), 470 U.S. 68, 84 L. Ed. 2d 53, 105 S. Ct. 1087. In *Ake*, the United States Supreme Court held that an indigent defendant has a constitutional right to the appointment of a psychiatrist under certain circumstances. Specifically, where a defendant makes a preliminary showing that his sanity is a factor, a defendant must be permitted access to a psychiatrist. In addition, where the State presents psychiatric evidence of a defendant's future dangerousness as an aggravating factor at sentencing, a defendant is also entitled to the assistance of a psychiatrist to rebut this evidence. The Supreme Court noted that the appointment of a psychiatrist under such circumstances "may well be crucial to the defendant's ability to marshal his defense." *Ake*, 470 U.S. at 80, 84 L. Ed. 2d at 64, 105 S. Ct. at 1095.

We do not agree that the reasoning supporting the Supreme Court's decision in *Ake* compels a finding that a mitigation specialist is constitutionally required at a capital sentencing hearing. Unlike the psychiatric expert sought in *Ake*, a mitigation expert is not crucial to the defendant's ability to marshal evidence in mitigation. We have specifically held that a trial court is not

constitutionally required to appoint a mitigation expert, or even an investigator, because defense counsel is capable of obtaining and presenting such information. (*People v. Lear* (1991), 143 Ill. 2d 138, 148.) We further note that even *Ake* did not provide that an indigent defendant has a constitutional right to choose a particular psychiatrist or receive funds to hire his own. (*Ake*, 470 U.S. at 83, 84 L. Ed. 2d at 66, 105 S. Ct. at 1096.) Defendant was provided with the assistance of counsel, an investigator, and a psychologist for the purposes of securing and presenting mitigation evidence. Defendant was given adequate assistance to prepare and present his mitigation evidence and accordingly his constitutional rights were not violated by the denial of a mitigation expert.

Where no constitutional right is implicated, the decision to appoint such an expert rests within the sound discretion of the trial court. (*People v. Hall* (1993), 157 Ill. 2d 324, 339-40.) After extensive argument concerning the role of a mitigation expert and the evidence in this case, the trial court determined that the mitigation expert was not required because defendant would be provided with an investigator and a psychologist in order to secure and analyze mitigation evidence. We find that the trial court did not abuse its discretion in denying defendant's motion to appoint a specific mitigation specialist.

## VI

Defendant next contends that his death sentence is unreasonably disparate from the 40-year term of imprisonment imposed upon Booth. In support, defendant notes that it was Booth who insisted on going to Roy's house to collect a debt. Defendant further argues that Booth was solely responsible for the shooting of Muto. The State disputes this characterization.

The following principles are applicable to a review

of a defendant's death sentence. Our duty under both the United States and Illinois Constitutions is to prevent arbitrary and capriciously imposed death sentences. (*People v. Bean* (1990), 137 Ill. 2d 65, 134.) In reviewing whether a death sentence is arbitrary, this court has compared the sentences received by other accomplices in the crimes. (*Bean*, 137 Ill. 2d at 134; *People v. Gleckler* (1980), 82 Ill. 2d 145, 167; *People v. Szabo* (1983), 94 Ill. 2d 327, 351-53.) In making this comparison, the court has focused on the nature of the offense and each individual's relative involvement, their character and background, and their criminal record and potential for rehabilitation. (See Ill. Const. 1970, art. I, § 11; *Bean*, 137 Ill. 2d at 134; *Gleckler*, 82 Ill. 2d at 162-66.) Similarly situated individuals must not be given arbitrary or unreasonably disparate sentences. *People v. Godinez* (1982), 91 Ill. 2d 47, 55.

We do not agree that defendant's death sentence was arbitrary when compared to the 40-year sentence received by Booth. First, defendant was not similarly situated because Booth was only 14 years old at the time of this occurrence and therefore ineligible for the death penalty. (See 720 ILCS 5/9—1(b) (West 1992); *Szabo*, 94 Ill. 2d at 353 (finding 16-year-old codefendant's sentence of four years' imprisonment was not disproportionate to defendant's death sentence where codefendant was ineligible for that sentence).) Second, we note that Booth negotiated a guilty plea, with an agreed sentence, to one murder and was sentenced to 40 years' imprisonment. In contrast, defendant entered a blind guilty plea and was convicted of two murders and armed robbery. Third, defendant had a long criminal record including convictions for robbery, theft, forgery and escape. In contrast, Booth's record indicated truancy problems and juvenile adjudications of theft and disorderly conduct. In fact, the sentencing judge expressly found that Booth's lack

of a serious criminal record was a mitigating factor at his sentencing. Fourth, we believe defendant's conduct is more culpable because it was defendant, not Booth, that precipitated the violence at Roy's home. Consequently, we reject defendant's contention that his death sentence is unreasonably disproportionate from the 40-year sentence imposed on Booth.

## VII

Last, defendant raises several general challenges to the Illinois death penalty statute (720 ILCS 5/9—1(g) (West 1992)). Defendant first argues that the Illinois death penalty statute violates the eighth and fourteenth amendments because it places a burden of proof on the defendant and therefore precludes meaningful consideration of mitigation. Specifically, defendant asserts that the statute violates the eighth amendment by providing for the death penalty where evidence in mitigation is "not sufficient to preclude" it.

This court has repeatedly rejected the argument that the Illinois death penalty statute places a burden on the defendant to prove that death is an inappropriate penalty. (*People v. Guest* (1986), 115 Ill. 2d 72, 112; *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 446; *People v. Simms* (1991), 143 Ill. 2d 154, 184; *People v. Fields* (1990), 135 Ill. 2d 18, 76.) In so holding, this court has determined that neither the State nor the defendant bears the burden of proof at the second stage of a capital sentencing hearing. (*Fields*, 135 Ill. 2d at 76; *People v. Olinger* (1986), 112 Ill. 2d 324, 351; *People v. Owens* (1984), 102 Ill. 2d 88, 115.) We find the issue well settled and decline defendant's invitation to reexamine it.

Defendant next argues that the Illinois death penalty statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily and capriciously imposed death sentences. Defendant does not advance any specific argument in support of his posi-

tion, but instead asks us to reconsider prior decisions on this issue. We note that this court has repeatedly rejected such challenges. (*People v. Ashford* (1988), 121 Ill. 2d 55, 90; *Albanese*, 104 Ill. 2d at 539-42; *People v. Perez* (1985), 108 Ill. 2d 70, 95-98.) Further, this court has also rejected the argument that various challenged aspects of the death penalty statute, in combination, invite arbitrarily imposed death sentences. (*Simms*, 143 Ill. 2d at 185; *People v. Tenner* (1993), 157 Ill. 2d 341, 390.) Defendant presents no reason to reexamine those cases.

## CONCLUSION

For the reasons stated, the judgment of the circuit court of Stephenson County is affirmed. We direct the clerk of this court to enter an order setting Wednesday, January 17, 1996, as the date on which the sentence of death entered by the circuit court of Stephenson County is to be carried out. The defendant shall be executed in the manner provided by law. (725 ILCS 5/119—5 (West 1992).) The clerk shall send a certified copy of the mandate in this case to the Director of Corrections, the warden at Stateville Correctional Center, and the warden of the institution where the defendant is now confined.

*Affirmed.*